**Ronny DEATON and Barbara Deaton, Appellants,**

v.

**UNITED MOBILE NETWORKS, L.P., Appellee.**

**No. 06–95–00096–CV.**

Court of Appeals of Texas, Texarkana.

Submitted Feb. 8, 1996.

Decided April 17, 1996.

Rehearings Overruled with Substituted Opinion July 18, 1996.

Rehearings Overruled Aug. 13,1996.

---

John R. Mercy, Atchley, Russell, Waldrop, Texarkana, for appellants.

Larry Powers, Powers & Blount, Sulphur Springs, for appellee.

Before CORNELIUS, C.J., and GRANT and STARR, JJ.

**OPINION**

GRANT, Justice.

Ronny and Barbara Deaton appeal from a judgment finding violations of a noncompetition agreement and awarding damages and injunctive relief.

The Deatons contend that there is no or insufficient evidence to support the jury's finding that Ronny Deaton entered an agreement not to compete and breached that agreement or that he converted a customer list. They also contend that the amount of damages awarded for conversion is not supported by the evidence, that the trial court erred by entering an injunction against Barbara Deaton, that the court erred by awarding attorney's fees against Barbara Deaton, and that the trial court erred by entering judgment against Ronny and Barbara Deaton jointly and severally. They further contend that the trial court erred by reforming the noncompetition agreement because the geographic radius provided by the reformation was not reasonable or supported by the evidence and by entering judgment based on the noncompetition agreement because the Texas Business and Commerce Code provides that such damages are not recoverable if the court reforms the covenant not to compete. They also contend the court erred by not allowing them a reasonable time to object to the charge and by refusing to submit a jury question on monopoly practices.

Ronny Deaton started a two-way radio business in 1973. This business blossomed into three separate businesses and, by 1990, his primary income came from radio sales and air time sales from radio towers in the area. In 1990, United Mobile Networks purchased his business for $1.5 million. Counsel represents that the final agreement consisted of approximately fifty different documents, including two covenants not to compete. As part of the purchase agreement, Deaton was to become an employee of United Mobile

Networks and remain so for five years. In mid–1993, he began discussing termination of his employment before the end of the employment agreement. Deaton's wife and their two sons remained as employees of the business without written employment contracts.

Ronny Deaton's employment with United Mobile Networks terminated on November 9, 1993. The arrangement seems to have been that Deaton was no longer employed by United Mobile Networks, but was selling the radios as an independent salesman. The radios were then programmed to work with United Mobile Networks tower facilities. When he left United Mobile Networks, he obtained a computer disk containing a list of United Mobile Networks' customers. In January 1994, United Mobile Networks sent a letter to Deaton stating that he was in violation of the noncompetition agreement and directing him not to sell SMR radios.[1] It is undisputed that he has not done so since that time.

In December 1993, Barbara Deaton was fired after she was involved in an altercation with another United Mobile Networks salesman. Immediately thereafter, Barbara Deaton began filing with the Federal Communications Commission to obtain licenses that would permit her to establish an SMR system in competition with the one owned by United Mobile Networks. She also opened a business to sell two-way radios. In application forms filed with the manufacturers of the radios, Ronny Deaton was listed as an employee of the business. Barbara Deaton has continued to sell radios and have customers programmed onto United Mobile Networks systems through the trial of the suit.

On March 22, 1994, United Mobile Networks filed suit seeking a declaration that the covenant not to compete was valid and enforceable against Ronny Deaton, requesting an injunction and seeking damages for breach. United Mobile Networks later added Barbara Deaton as a defendant and requested damages for conversion, tortious interference, breach of fiduciary duty, breach of contract, breach of lease, and civil conspiracy.

At trial, the jury found (1) that Ronny Deaton and United Mobile Networks agreed the covenant not to compete would remain in effect after his voluntary termination of employment, (2) that Deaton had breached the covenant and converted the customer list and records, and (3) that United Mobile Networks were entitled to damages for breach of covenant and for conversion. The jury further found that Barbara and Ronny Deaton had entered into a civil conspiracy. The trial court entered judgment for United Mobile Networks awarding damages of $600,000 plus accrued interest and attorney's fees and granted a permanent injunction against further violations of the covenant not to compete.

The Deatons first contend that the trial court erred by entering a judgment against Barbara Deaton for $675,781.44 in damages, an injunction, and attorney's fees because there was no jury finding against her individually to support those remedies. The judgment against Barbara Deaton is necessarily rendered based upon the jury's finding that she engaged in a civil conspiracy with her husband, Ronny. The jury question was whether Ronny and Barbara entered into a conspiracy to do any one of four things: (1) violate the covenant not to compete; (2) tortiously interfere with plaintiff's customers; (3) breach defendant Ronny Deaton's fiduciary relationship with the plaintiff; or (4) breach the lease agreement with the plaintiff.

In *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 933–34 (Tex.1983), the Supreme Court held that the essential elements of an actionable civil conspiracy are: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result. The "unlawful, overt act" requirement places civil conspiracy in the category of an intentional tort.

■ Joint and several liability is proper when parties are in some way jointly liable, as in the context of a civil conspiracy. Barbara Deaton contends that civil conspiracy

1. SMR and UHF are two different types of radio transmission systems.

was not proven; thus, joint and several liability may not be imposed upon her for her husband's wrongful acts. In this case, the concept of civil conspiracy was used as a basis for establishing the joint and several liability among the multiple parties. *Carroll v. Timmers Chevrolet*, 592 S.W.2d 922, 925–26 (Tex.1979).[2]

Of the four theories for recovery submitted to the jury, it found in separate questions that tortious interference and breach of fiduciary relationship did not occur. The jury's finding that she was engaged in a conspiracy with her husband must be based upon the remaining findings: either a violation of the covenant not to compete or breach of the lease agreement.

■ There is no independent cause of action for conspiracy. Any finding of conspiracy must be based on some underlying tort. *Schoellkopf v. Pledger*, 778 S.W.2d 897, 900 n. 5 (Tex.App.—Dallas 1989, writ denied). An actionable conspiracy must consist of wrongs that would have been actionable against the conspirators individually. *International Bankers Life Insurance Co. v. Holloway*, 368 S.W.2d 567, 581 (1963). These cases further hold generally, if an act by one person cannot give rise to a cause of action, then the same act cannot give rise to a cause of action if done pursuant to an agreement between several persons. *Schoellkopf*, 778 S.W.2d at 900; *Gulf & Atlantic Life Ins. Co. v. Hurlbut*, 696 S.W.2d 83, 102 (Tex.App.—Dallas 1985), *rev'd on other grounds*, 749 S.W.2d 762 (Tex.1987). This concept was most recently addressed by this Court in *Closs v. Goose Creek Consolidated ISD*, 874 S.W.2d 859, 871–72 (Tex.App.—Texarkana 1994, no writ).

As a general rule, an actionable conspiracy must consist of wrongs that could have been actionable against the individual conspirators. The Supreme Court has most recently held that civil conspiracy, "generally defined as a combination of two or more persons to accomplish an unlawful purpose, or to accomplish a lawful purpose by unlawful means,

might be called a derivative tort." *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex.1996). The court also held that a defendant's liability for conspiracy depends on his participation in some underlying tort for which the plaintiff seeks to hold at least one of the named defendants liable. *See generally* J. HADLEY EDGAR, JR. & JAMES B. SALES, 1 TEXAS TORTS AND REMEDIES § 3.02[2] (1996).

■ The question is whether some tort has been shown to exist in this case. Breach of contract is by definition actionable, but breach of contract is not a tort. In *Southwestern Bell Telephone Co. v. DeLanney*, 809 S.W.2d 493, 493–95 (Tex.1991), the Court reviewed a plaintiff's effort to recover against Southwestern Bell for its failure to publish a yellow pages advertisement in accordance with the contract between the parties. In *DeLanney*, the Supreme Court held that when a defendant's conduct would give rise to liability independent of the fact that a contract exists between the parties, the plaintiff's claim may also sound in tort. 809 S.W.2d 493. The court recognized that the act of a party may breach duties in tort or contract alone or simultaneously in both. "The nature of the injury most often determines which duty or duties are breached. When the injury is only the economic loss to the subject of a contract itself the action sounds in contract alone." *DeLanney*, 809 S.W.2d at 495, quoting *Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex.1986).

United Mobile Networks contends that Ronny Deaton's conversion of the customer list that occurred along with his breach of the noncompetition agreement constitutes the independent tort needed to support the finding of civil conspiracy. However, the facts parallel those of *Southwestern Bell*, where the breach of contract was actually caused by an underlying negligent act.

■ Even if Barbara Deaton assisted Ronny Deaton in breaching his contract—by providing a workplace from which he could take actions that constituted its breach, since

---

**2.** In *Carroll v. Timmers Chevrolet*, 592 S.W.2d 922 (Tex.1979), the Supreme Court distinguished this concept from that of vicarious liability for concerted action, pointing out that civil conspiracy came to be used to extend liability in tort beyond the active wrongdoer to those who merely planned, assisted, or encouraged his act.

breach of contract is not a tort, her assistance could not constitute conspiracy. The jury did not find tortious interference with the contract. In the remaining argument, the question is whether Ronny's taking of the customer list—presumably to assist either his own sales abilities or the business—constitutes a tort for which Barbara could be held liable as a coconspirator for her employee's wrongful act. The argument necessarily relies upon Ronny Deaton's act, because there was no allegation or evidence that Barbara Deaton was in any way involved, other than as an employer utilizing information provided by her employee.

The holding of the Supreme Court in *Tilton* disposes of this argument. The Court held that since the damages were purely monetary (as in this case), and that the recovery was based solely upon contract considerations, a conspiracy theory would not lie and that breach of contract was the sole remedy.

Barbara Deaton was not a party to the contract containing the noncompetition clause. In the absence of a jury finding that she assisted or conspired in the commission of the tort of conversion, the finding of civil conspiracy cannot be supported by the jury's answers. Thus, the court erred by entering an injunction against Barbara Deaton and by holding her jointly and severally liable for damages awarded pertaining to the breach of contract.

The Deatons next contend there was insufficient evidence to support the jury's finding that the covenant not to compete existed or that the covenant was breached. The Deatons also contend that the trial court erred by reforming the noncompetition agreement to prohibit competition within a 100–mile radius of Winnsboro, Texas, because the reformation was not reasonable.

█ In our review of the evidence, we test the factual sufficiency of that evidence by examining the entire record to determine whether the finding is clearly wrong and unjust. *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951).

█ The trial court determined that the contract was ambiguous as a matter of law.

*Exxon Corp. v. West Texas Gathering Co.*, 868 S.W.2d 299, 302 (Tex.1993). The Court thus properly submitted a jury question inquiring on the basis of the evidence what the contract term meant. Ronny Deaton argued that the covenant provided that if he voluntarily resigned his employment with United Mobile Networks, he could void the covenant not to compete. There was testimony that the continued viability of the covenant not to compete was discussed on many occasions during negotiations with Deaton, and Mike Williams testified that he had agreed that the covenant would continue after he voluntarily left in November 1993. A letter exhibit signed by Deaton reflects his understanding that the covenant would continue by his requesting an exemption from the covenant so that he could install service radios.

The jury found in separate answers that the 1990 contract was still in effect and that the parties had agreed independently of the November 9, 1990 employment agreement that the covenant would continue. The evidence supporting the second finding showed that United Mobile Networks was releasing Deaton from the last two years of his employment agreement and obligating itself to allow him to be an independent salesman, selling radios in competition with United Mobile Networks and to program his customers onto the United Mobile Networks system at the same rates charged by United Mobile Networks to its customers. In exchange for that consideration, Deaton agreed the covenant would remain in effect after November 19, 1993. Violations of the covenant not to compete were proven by testimony from multiple sources. Thus, there was sufficient evidence to support the jury's verdict on these questions.

█ The further question is whether the trial court erred by limiting the geographic area of the covenant not to compete. The covenant not to compete constitutes a restraint of trade and is thus subject to specific requirements. First, the agreement not to compete must be ancillary to an otherwise valid transactional relationship. Second, the restraint created by the agreement not to compete must not be greater than necessary to protect the promisee's legitimate interest.

An agreement not to compete which is not appropriately limited may be modified and enforced to the extent necessary to protect the promisee's legitimate interest. Third, the promisee's need for protection afforded by the agreement not to compete must not be outweighed by either the hardship to the promisor or any injury likely to the public. *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 682 (Tex.1990).

■ In this case, one of the noncompetition agreements executed in conjunction with the asset purchase agreement between these two parties provided a geographic limitation of 150 miles outside the boundary of the business activity. This requirement would have excluded Deaton from his chosen profession in the whole of Northeast Texas. The trial court concluded that this limitation was excessive and reformed the covenant by limiting the noncompetition covenant to the heart of United Mobile Networks' business activity, within a 100-mile radius of a fixed point. By so doing, the court necessarily concluded that United Mobile Networks' legitimate business interests would be served and yet Deaton would have an opportunity to pursue his livelihood. The reformation is supported upon evidence of the main thrust of business activity by United Mobile Networks and the contractual limitations provided in the original noncompetition agreement. Tex. Bus. & Com.Code Ann. § 15.51(c) (Vernon Supp.1996) specifically authorizes reformation. The court's decision is supported by the evidence.

■ Under Tex. Bus. & Com.Code Ann. § 15.51(c), the reformation of the geographic area precludes the recovery of damages for breach of covenant prior to the reformation. Thus, the parties agree that the trial court's judgment should be reformed to delete the $100,000 in damages awarded for breach of covenant.

The Deatons also contend there was no evidence to support the jury's finding that Ronny Deaton breached the covenant not to compete after the termination of his employment with United Mobile Networks. United Mobile Networks had agreed that Deaton would be an independent dealer for it, selling SMR radios that would be programmed to United Mobile Networks' towers after November 9, 1993. The evidence shows that he was an independent dealer for two months and that, on January 14, 1994, United Mobile Networks told Deaton to stop selling radios. The evidence shows that he immediately quit selling radios and that he has not done anything to compete with United Mobile Networks since that date. Therefore, even absent the cited provision of the Business and Commerce Code, the $100,000 in damages for breach of the covenant must be overturned. The judgment will be reformed accordingly.

The Deatons next contend that a customer list is not a proper subject for a claim of conversion. The largest amount of money awarded in this case came from United Mobile Networks' successful contention that Ronny Deaton had converted the customer list to his own use. The evidence showed that the customer list was one of the major items purchased by United Mobile Networks, at a cost of $450,000, when they bought Deaton's business in 1990. The undisputed evidence showed that Ronny Deaton instructed Ernie Jones, a subordinate at United Mobile Networks, to download United Mobile Networks' customer list onto a disk for his use.

■ Conversion is the wrongful exercise of dominion and control over another's property in denial of or inconsistent with the true owner's rights. *Bandy v. First State Bank*, 835 S.W.2d 609, 622 (Tex.1992). The Deatons suggest that taking a copy of the customer list was not wrongful, that it was not a tangible property subject to conversion, that Ronny Deaton did not interfere with United Mobile Networks' right to dominion and control over the customer list, and that, as a matter of law, taking a copy of the customer list is not conversion.

Several Texas courts have analyzed the difficulty in determining whether such lists are confidential information and thus could be appropriated. There is authority for the position that information one can readily obtain in the general industry cannot be appropriated as being confidential. *Numed, Inc. v. McNutt*, 724 S.W.2d 432, 434–35 (Tex. App.—Fort Worth 1987, no writ). However, other Texas courts, including this Court,

763

have focused on the method used to obtain the information and held that even if the customer information was readily accessible in the industry, liability was appropriate if the competitor actually gained information in usable form while working for the former employer. *American Precision Vibrator Co. v. National Air Vibrator Co.*, 764 S.W.2d 274, 276–78 (Tex.App.—Houston [1st Dist.] 1988, no writ); *Jeter v. Associated Rack Corp.*, 607 S.W.2d 272, 276 (Tex.Civ.App.—Texarkana 1980, writ ref'd n.r.e.), *cert. denied*, 454 U.S. 965, 102 S.Ct. 507, 70 L.Ed.2d 381 (1981); *see M.N. Dannenbaum, Inc. v. Brummerhop*, 840 S.W.2d 624 (Tex.App.—Houston [14th Dist.] 1992, writ denied).

Based upon this Court's conclusion in *Jeter*, the illegal taking of the customer information would constitute conversion. The Deatons' argument that Ronny Deaton's taking did not constitute conversion as a matter of law fails.

The Deatons also contend that, because Ronny Deaton only took a copy of the list, no conversion occurred. However, it has been held that conversion of an asset by taking a copy of the asset constitutes conversion of the property to the use of the taker. *Chandler v. Mastercraft Dental Corp.*, 739 S.W.2d 460, 469 (Tex.App.—Fort Worth 1987, writ denied). In *Chandler*, the court allowed recovery of damages for conversion of a customer list and copies of molds, castings, and patterns.[3]

We recognize that customer lists are critical information for any business activity to maintain. Indeed, customer lists are often sold by marketing agencies to companies for substantial amounts of money. In many ways, such lists can constitute the keystone for a company's efforts to build or maintain sales by their business. *See Murrco Agency, Inc. v. Ryan*, 800 S.W.2d 600 (Tex.App.—Dallas 1990, no writ).

When the taking of a copy deprives the company of the exclusive possession of the list or gives a competitor the advantage of having the list, this may damage or destroy the value of the asset. The taking of a *copy* can be the wrongful exercise of dominion and control over the information which is inconsistent with the true owner's rights.

Counsel further argues that the trial court erred in awarding $500,000 in damages for conversion of a copy of the customer list because such damages for a copy are speculative and unsupported by the evidence. The jury's answer was based upon the amount of money it would take to reasonably compensate the plaintiff for the fair market value of its customer list.

Fair market value is typically defined as the amount a willing buyer, who desires to buy, but is under no obligation to buy, would pay to a willing seller, who desires to sell, but is under no obligation to sell. *City of Pearland v. Alexander*, 483 S.W.2d 244, 247 (Tex.1972). As applied in this context, the measure of damages for conversion is the value of the property at the time and place of conversion. *Prewitt v. Branham*, 643 S.W.2d 122, 123 (Tex.1982). There are other measures of damages for conversion based upon unjust enrichment to the converting party. *Newman v. Link*, 866 S.W.2d 721, 726 (Tex.App.—Houston [14th Dist.] 1993), *writ denied*, 889 S.W.2d 288 (Tex.1994). Texas courts have drawn a distinction in some conversion cases between an intentional, willful, or malicious act and a good faith inadvertence in converting property. *Sadler v. Duvall*, 815 S.W.2d 285, 290 (Tex.App.—Texarkana 1991, writ denied). In the present case, the conduct could be described as intentional and willful.

At trial, Deaton vigorously objected to the failure of the court to limit the damages to the value of the copy that was taken as the correct measure of damages necessary

3. In *Chandler v. Mastercraft Dental Corp.*, the court awarded $25,000 for the fair market value of trade secrets, patterns, molds, castings, devices or compilations of information converted by Chandler and Johnson. There was evidence that the tooling equipment itself was of the value of $50,000. There was also evidence that the trade secrets were valued at $20,000, and the customer list was included in this value. The testimony did not indicate whether the owner was deprived itself of the use of the customer list or whether the evaluation was calculated with that in mind. Therefore, this judicial determination cannot be applied to the point of error dealing with the market value of the list in the present case.

to compensate the plaintiff for its loss because the plaintiff had not been deprived of the list itself. Deaton continues to argue that by the language of the issue submitted, the jury was not asked to compensate the party for the injury suffered, which was deprivation of a *copy* of the list. The company was not deprived of this physical list, but it was *duplicated* for use by a competing business. The taking denied United Mobile Networks the *exclusive* use of the information and thus deprived the company of the asset to the extent that its value was dependent on exclusive access. The evidence shows that the customer list was originally purchased by United Mobile Networks from Ronny Deaton in 1990 for $450,000. This amount of the actual sale of the list in question was significant evidence on the value of the list, but Deaton sold United Mobile Networks the exclusive list, along with the conveyance of the entire business and a covenant not to compete from Deaton.

United Mobile Networks sought damages on the basis of compensation for its loss. It presented testimony by Dale Walsh as an expert in the area of SMR systems purchase and sales that the value of the customer list at the time of conversion was $544,733.93. He testified about the fair market value of the customer list. Walsh testified that the customers acquired after the purchase from Deaton, being the UHF customers, were on a list which he evaluated at $78,412.94. To determine the value of the lists, he determined what the predicted gross income from air time sales to the customers would be over a five-year period and discounted that gross amount (at a ten percent discount rate) to a present value. He averaged the monthly air time sales as being $104.86 per month per customer. He also took the predicted maintenance revenues (from broken radios and the like) and averaged it to be $3.00 per customer, calculating a five-year gross and discounting to present value. He calculated a 1.2 percent per month attrition rate for customers, based upon the experience of the company. He testified that the list was one of the assets to be valued in purchasing a business of this type because its income is derived from the revenue generated from those customers.

Walsh termed his ultimate calculation to be a fair market value. He did not testify to the loss of the exclusive use of the list, but rather based his value on the income generated from the customers on the list. Thus, it was based upon the concept that only one business entity has the income generated by the customers on the list. This was not evidence of what would reasonably compensate United Mobile Networks because United Mobile Networks was not deprived of the list and continued to use the list in its business. There was no evidence showing that United Mobile Networks was likely to lose this business entirely because of the taking of a copy of the list.

The difficulty in this case is that the expert Walsh made his calculations based upon the supposition that United Mobile Networks had lost the list and all the business generated from the list. There was no showing, however, that United Mobile Networks had been deprived of any of the customers or the monthly revenues or would be deprived of these customers in the future. Walsh agreed with counsel's statement summarizing his testimony as being that the customer list did not have any value according to his method of calculation if the customers were not generating revenue to the owners of the list. Therefore, this evidence does not provide a proper measurement to compensate United Mobile Networks for the loss or gain in this case because there was no evidence that the list had either generated any customers for Deaton or deprived United Mobile Networks of any customers. In its motion for rehearing, United Mobile Networks states that "it was the exclusive nature of the list and the opportunity to capture the customer's business which gives the customer list its value." Yet, the expert testimony offered by United Mobile Networks does not base its determination on the exclusivity of it, and the record shows that the company has not lost its opportunity to capture the customers' business because, according to the testimony, it still retains most of these customers.

United Mobile Networks further contends that it is the "opportunity to capture the customers' business which gives the custom-

er list its value." But this contention ignores the fact that at the time of the conversion and the trial, United Mobile Networks had already captured these customer's business, so it cannot establish damages on the basis of something it has not lost.

This evidence is insufficient to support a compensation to which United Mobile Networks would be entitled for the taking of this list under the circumstances, and the nature of the list taken. The company continued to use the list and was not deprived of its customers, but the expert testimony was based upon the premise that the company was deprived of the list and the customers on the list. We find the evidence factually insufficient to support the jury's finding of damages for the taking of the list. This point of error is sustained, and a new trial is granted for evidence to be presented on damages, to be based on the amount required to properly compensate United Mobile Networks for Ronny Deaton's conversion of a copy of the customer list.

The Deatons further suggest that if they are to be charged with damages for the entire cost of the exclusive ownership value of the customer list, they should be given exclusive ownership of the customer list. We disagree. To allow a party to profit from wrongful conduct is inappropriate and would encourage civil theft rather than deter it.

■ The Deatons next contend that the trial court erred by not allowing them a reasonable time during which to object to the charge. The charge conference in this case took about four hours. After discussing the charge for that period of time, the trial court combined the portions of the charges submitted that it believed appropriate and informed counsel that the charge would be submitted the next day. Counsel for the Deatons then requested additional time to review the charge created by the court. The court complained of counsel's interminable and repetitious complaints about various questions to be submitted and stated that counsel already had objected to and discussed the substance of the charge, but that he would give them another hour during which to review and object to the final charge.

Counsel declined the court's offer of an additional hour to review the charge, contending that the amount of time offered was inadequate. The court accepted counsel's offer not to spend the additional hour at court and closed the proceeding. The Deatons contend on appeal that their counsel should have been given additional time to review the charge. TEX.R. CIV. P. 272 provides in pertinent part that "[t]he charge shall be in writing, signed by the court.... It shall be submitted to the respective parties or their attorneys for their inspection, and a reasonable time given them in which to examine and present objections thereto outside the presence of the jury...."

The few cases discussing this issue state that the time allowed for objections and requests is a matter within the discretion of the trial judge and is reviewable only for a showing of abuse. *Federal Underwriters Exchange v. Tubbe*, 180 S.W.2d 473 (Tex.Civ. App.—Amarillo), *rev'd on other grounds*, 143 Tex. 216, 183 S.W.2d 444 (1944); *see Hargrove v. Texas Employers Ins. Assoc.*, 332 S.W.2d 121 (Tex.Civ.App.—Amarillo 1959, no writ); 4 McDONALD TEXAS CIVIL PRACTICE § 22.40 (rev.1992).

In this case, the four hours actually spent in reviewing and objecting to a twelve-page charge appears to be adequate. In light of the court's offer of an additional hour, the trial court did not abuse its discretion by this limitation.

The next morning, counsel for the Deatons tendered supplemental objections to the court's charge, consisting of forty pages of objections and proposed additional charges. A number of those requested instructions or questions contained handwritten notations reflecting that they were requested and denied. Counsel has directed this Court to no authority suggesting that the trial court erred by setting an ending time for objections. Counsel has not suggested any way in which the court's refusal to once again rule on their supplemental objections to the charge might have harmed them. In such a situation, error is not apparent and there is no showing of harm. Thus, this point is overruled.

■ In their final point of error, the Deatons contend that the trial court erred by refusing to submit Barbara Deaton's counterclaim to the jury asserting restraint of trade and monopoly against United Mobile Networks. The trial court refused to submit two jury questions.[4] The Deatons contend that there was some evidence to support the issues. A party is entitled to affirmative submission of all of its theories of recovery that have support in the pleadings and evidence. *Exxon Corp. v. Perez*, 842 S.W.2d 629, 631 (Tex.1992); *see* Tex.R. Civ. P. 278. Thus, if there was some evidence to support the submission of a question, refusal by the trial court to submit the question is reversible error. *Blonstein v. Blonstein*, 831 S.W.2d 468, 471 (Tex.App.—Houston [14th Dist.] ), *writ denied per curiam*, 848 S.W.2d 82 (Tex. 1992).

■ In order to prove that a monopoly exists in violation of state or federal law, the Deatons were required to prove:

(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of the superior product, business acumen, or historical accident.

*Caller–Times Publishing Co. v. Triad Communications*, 826 S.W.2d 576, 580 (Tex.1992), *quoting United States v. Grinnell Corp.*, 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). The second element may be established by showing that the monopolist charged predatory prices. *Id.* If there were some evidence to support the submission of a question, refusal by the trial court to submit the question is reversible error. *Blonstein*, 831 S.W.2d at 471. The two issues were based upon alleged violations of Tex. Bus. & Com.Code Ann. § 15.05(a), (b) (Vernon 1987):

(a) Every contract, combination, or conspiracy in restraint of trade or commerce is unlawful. [requested question 20]

(b) It is unlawful for any person to monopolize, attempt to monopolize, or conspire to monopolize any part of trade or commerce. [requested question 17]

The first question is whether there was any evidence to support Barbara Deaton's allegation that there was some contract, combination, or conspiracy involved that would have supported giving question 20 to the jury. The noncompetition clause in her husband's contract is by definition a restraint of trade. However, that type of restraint is by statute available in specified circumstances. Tex. Bus. & Com.Code Ann. § 15.50 (Vernon Supp.1996). The court reviewed the contract and surrounding circumstances and found it lawful except for an excessive geographic restriction, which the court reformed under the authority of Tex. Bus. & Com.Code Ann. § 15.51 (Vernon Supp.1996). *Light v. Centel Cellular Co. of Texas*, 883 S.W.2d 642 (Tex. 1994). Thus, the existence of this lawful contract would not support an allegation of monopoly practices. Counsel has directed this Court to no other evidence suggesting that there was any contract that caused the monopoly power to come into existence, any combination between companies or individuals that would do likewise, or any conspiracy that would cause such a restraint of trade. Thus, the trial court did not err by refusing to send question 20 to the jury.

Counsel contends that the following evidence provides support for submission of the jury question on monopolies: (1) Barbara Deaton was not subject to a covenant not to compete; (2) Barbara Deaton was fired from her position with United Mobile Networks; (3) Barbara Deaton wanted to start her own two-way radio sales and service business; and (4) Barbara Deaton was prevented from doing so by United Mobile Networks.

As defined above, to "monopolize" is to obtain (1) the possession of monopoly power in a relevant market, combined with (2) the willful acquisition or maintenance of the power as distinguished from growth or develop-

---

4. The requested questions read as follows:
    Did United Mobile Networks, L.P. monopolize, attempt to monopolize, or conspire to monopolize the SMR mobile communications market in Northeast Texas?

    . . . .

    Did United Mobile Networks, L.P. enter into a contract, combination, or conspiracy in restraint of trade or commerce?

ment as a consequence of superior product, business acumen, or historical accident.

There was no evidence of competing products or the relevant geographic market. Thus, there is no proof that United Mobile Networks *actually* had monopoly power. The fact that it had the sole SMR tower in the area does not mean that it had a communications monopoly. There are multiple other forms of communication available, and there was no evidence that its control over this particular format, combined with unwillingness to permit anonymous individuals to purchase air time, constituted a monopoly.

The evidence also does not show willful and wrongful acquisition in maintenance of the power as distinguished from growth or development as a consequence of historical accident. Thus, no showing of monopoly practices has been made. At most, this evidence might be read to show that some form of competition existed between the parties.

The evidence presented to the jury was not directed at questions of monopoly, and the evidence does not provide a sufficient showing of monopolization and/or restraint of trade to justify sending these issues to the jury.

The trial court did not err by refusing to submit these issues to the jury.

## CONCLUSION

### Severance

The portion of this case involving the conversion of the customer list by Ronny Deaton is severed from the portion of the case involving breach of the noncompetition covenant and the conspiracy claims.

### Noncompetition and Conspiracy

The judgment of the trial court reforming the noncompetition covenant is affirmed as to Ronny Deaton, but the award of $100,000 for breach of the noncompetition covenant is deleted.

The provision of the judgment enjoining Barbara Deaton is dissolved, and the provision holding her jointly and severally liable is reversed and rendered for all purposes.

### Conversion

Because we may not order a separate trial on unliquidated damages when liability is contested, we must therefore remand the conversion portion of this case against Ronny Deaton for a new trial. TEX.R.APP. P. 81(b)(1).