**SAN SABA ENERGY, L.P., R.L. Zinn, Ltd., Gilbert Goldstein, and Nanzin Family Limited Partnership, Appellants,**

v.

**Charles T. McCORD, III, McCord Production, Inc., and McCord Investments, Inc., Appellees.**

No. 10–03–00159–CV.

Court of Appeals of Texas, Waco.

April 13, 2005.

Rehearing Overruled May 24, 2005.

Michael T. Trefny, Fant & Burman, LLP, Houston, for appellants.

Dick Watt, Matthew B. Henneman, Watt Beckworth & Thompson, Houston, for appellees.

Before Chief Justice GRAY, Justice VANCE, and Justice REYNA.

## OPINION

FELIPE REYNA, Justice.

San Saba Energy, L.P. and others (collectively referred to as "San Saba") filed suit against Charles T. McCord, III, McCord Production, Inc., and McCord Investments, Inc. (collectively referred to as "McCord")[1] alleging that McCord breached two contracts executed in connection with the parties' agreement to jointly develop their oil and gas interests within a defined area of mutual interest (the "AMI") and that McCord "engaged in a plan and scheme to defraud" San Saba out of additional mineral interests San Saba would have been entitled to under the contracts. The court granted McCord's summary judgment motion and rendered a take-nothing judgment against San Saba.

San Saba contends in four issues that the court erred by granting McCord's summary judgment motion because: (1) the parties' contracts required McCord to offer San Saba a proportional interest in certain oil and gas interests which McCord acquired (or acquired the right to acquire) in a 605–acre tract which lies within the AMI; (2) a genuine issue of material fact remains on the question of whether McCord acquired oil and gas interests within the AMI subject to the parties'

---

1. San Saba named numerous other defendants in the suit as well. However, the trial court severed San Saba's claims against McCord from its claims against the other defendants.

contracts; (3) a genuine issue of material fact remains on the question of whether McCord participated in a plan and scheme to defraud San Saba out of this proportional interest; and (4) a genuine issue of material fact remains on the question of whether San Saba suffered damages.

## Factual Background

In November 1997, San Saba, McCord, and others signed a purchase and participation agreement and a separate operating agreement with the Louisiana Land and Exploration Company ("LLEC") whereby the former parties conveyed to LLEC a 75% working interest in the oil, gas, and other minerals in the AMI. Under the terms of these agreements, LLEC (the operator) would drill an initial well at its own expense. If the initial well was not a dry hole, then each of the other parties (the non-operators) could elect to participate in the completion of the initial well, each participant thereafter bearing its proportionate share of expenses.

The agreements also require each of the parties to share any additional mineral interest they acquired in the AMI. However, each agreement describes this obligation differently. Paragraph 1.2 of the purchase and participation agreement defines "Additional AMI Interests" as "any additional oil, gas or mineral interest or right to acquire such interest covering any portion of the AMI, other than the Leases and the Additional Leases." [2]

Paragraph 3.4 of the purchase and participation agreement provides:

**2.** According to the purchase and participation agreement, "the Leases" are the various oil and gas interests within the AMI which the non-operators owned at the time they entered the agreement. Paragraph 1.3 of the purchase and participation agreement defines the term "Additional Leases" as "leasehold interests, other than the Leases, acquired by LL & E(a) covering any portion of the AMI prior to

3.4 *Additional AMI Interests.* Any Additional AMI Interest acquired by LL & E or any Seller shall be shared by LL & E and Sellers pursuant to Section XV.A. of the Operating Agreement, which Section provides, among other things, that the persons or entities specified, and in the proportions set out, in Schedule "6" hereto shall be entitled to receive, at no cost to them and without regard to any working interest participation election made by them or any other party pursuant to such Section XV.A., an overriding royalty interest in the lands covered by any leasehold interest acquired as an Additional AMI Interest equal to the difference between 25% and the burdens of record existing on any such Additional AMI Interest, as more particularly described in such Section XV.A. and such Schedule "6." LL & E agrees to use reasonable efforts to obtain the lowest royalty burden possible when it acquires any Additional AMI Interest.

Section XV.A. of the operating agreement also describes the parties' respective obligations with regard to additional AMI interests. This section provides in pertinent part:

Except in connection with the last paragraph of this Section A,[3] should any party hereto acquire a lease interest, royalty, overriding royalty, or mineral right affecting any lands within the AMI or acquire the right to acquire any such interest (*i.e.,* by farmin), such party (hereinafter called the *"Acquiring*

the Initial Well reaching Casing Point, whether obtained pursuant to a Seismic Operation, other seismic option, or otherwise or (b) pursuant to a Seismic Option at any time."

**3.** The last paragraph of Section A defines the parties' rights and obligations if LLEC acquires additional leases within the AMI.

*Party* ") shall immediately give written notice thereof to the other parties, together with all pertinent details and information, including (for illustrative purposes) cost of acquisition, royalty, overriding royalty, or other such burdens or unusual obligations affecting such interest or the right to acquire the same. Should any party acquire any interest (or acquire the right to acquire an interest) that covers lands situated partially within and partially outside of the AMI, then the provisions of this Article XV.A shall apply to such interest or right both within and outside of the AMI as a whole.

The party (or parties) to whom such notice is given shall have a period of twenty (20) days exclusive of Saturdays, Sundays, or legal holidays after receipt of such notice to evidence, in writing, whether or not it elects to acquire its proportionate interest (in the same proportion that is set forth on Exhibit "A" III.D for such person) for payment of a like proportion of the acquisition costs. (footnote added).

The purchase and participation agreement and the operating agreement are attached to each other as exhibits, and each is incorporated by the other. Paragraph 4.20 of the purchase and participation agreement provides, "In the event of a conflict between the provisions of this Agreement and those of the Operating Agreement, the provisions of this Agreement shall control." [4]

In March 1998, McCord entered a program agreement with O'Sullivan Oil & Gas Company, Scully Oil & Gas Company, and others. Under this agreement, O'Sullivan agreed "to identify and evaluate investment opportunities in the oil and gas in-

dustry." McCord agreed to provide operating capital, in exchange for which McCord received "the right to participate in any Investment Opportunity that has been identified and selected for acquisition by this Program, in any amount up to an undivided 25% of the interest to be acquired." The program agreement further provides:

> With respect to each Investment Opportunity acquired by this Program, each party electing to participate and participating in that acquisition shall (a) be deemed the owner of the undivided interest therein that he or it is entitled to take or has elected to take, as the case may be, and (b) shall be entitled to receive from O'Sullivan, at such time as he or it so elects, an assignment (recordable assignment if the interest can be established as a matter of public record) of his *pro rata* part of any oil and gas lease, contractual right, program partnership, membership, corporate stock acquired as the Investment Opportunity, and (c) shall be free to deal with its *pro rata* undivided interest therein either with or independently of this Program, as it chooses.

Pursuant to the program agreement, Osprey Resources, Inc. purchased the 605–acre Perez ranch and certain royalty interests, which lay within the AMI. In addition, O'Sullivan acquired an oil and gas lease conveying the mineral estate in and under the Perez ranch which was originally executed in favor of the Sue–Ann Oil & Gas Company. O'Sullivan notified McCord of these acquisitions in June or July of 1998, and McCord agreed to participate in them.

---

**4.** The operating agreement has a similar provision which states that it controls in the event of a conflict, except with respect to the purchase and participation agreement and the parties' gas balancing agreement.

McCord paid its pro rata share of the acquisition costs for the Perez ranch and the Sue–Ann lease. In August 1998, McCord determined that the Perez ranch lay within the AMI and notified O'Sullivan that it had elected to not participate in the ownership of the surface and mineral estates which had been acquired. O'Sullivan advised that it was about to sell these interests and suggested that McCord accept its pro rata share from the proceeds of the sales as reimbursement. McCord agreed to this arrangement.

O'Sullivan assigned a portion of the Sue–Ann lease that same month to Pursuit Exploration Company, another party to the purchase and participation agreement and the operating agreement. O'Sullivan assigned to Pursuit the oil and gas leasehold interest "lying below the subsurface depth of 9,765 [feet]." O'Sullivan sold the surface estate in November. O'Sullivan reimbursed McCord for 25% of the proceeds from these conveyances.

Because Pursuit Exploration was a party to the purchase and participation agreement and the operating agreement, it notified the other parties of its acquisition of that portion of the Sue–Ann leasehold lying beneath 9,765 feet. McCord elected to participate in the lease. San Saba declined.

### Procedural Background

San Saba alleges in its eighth amended petition that McCord breached the parties' agreements by failing to offer a proportional share of the interests and/or rights of acquisition which McCord acquired in the surface and mineral estates of the 605–acre tract. San Saba alleges that McCord engaged in "an elaborate sham" with Pursuit Exploration, O'Sullivan, and Scully to defraud San Saba out of the mineral interests it would have otherwise been entitled to under the agreements.

McCord filed a motion for summary judgment alleging: (A) "engaging in a plan or scheme to breach a contract is not a valid cause of action"; (B) under the terms of the joint operating agreement, there was no breach because (1) McCord never acquired title to any interest in the 605–acre tract, (2) McCord never acquired any "farmin" rights in the 605–acre tract, and (3) the purchase and participation agreement did not change McCord's obligations with respect to additional mineral interests acquired in the AMI; and (C) there is no evidence that San Saba suffered damages as a result of McCord's conduct.

In response, San Saba contended: (A) the terms of the purchase and participation agreement control over the terms of the operating agreement with respect to additional mineral interests acquired in the AMI; (B) a genuine issue of material fact remains on the question of whether McCord acquired an interest which he had an obligation to offer to the other parties under the terms of the agreements; (C) a genuine issue of material fact remains on the question of whether McCord conspired with others to defraud San Saba; and (D) a genuine issue of material fact remains on the amount of profits San Saba lost as a result of McCord's conduct.

### Breach of Contract Claim

San Saba contends in its first and second issues that a genuine issue of material fact remains on the question of whether McCord acquired (or acquired the right to acquire) an oil and gas interest in which the parties' contracts required McCord to offer San Saba a proportional share. McCord responds that no fact issue exists because the agreements required it to offer a proportional share of additional interests to the other parties only if it acquired actual title to such additional interests or if it acquired a farm-in interest.

To resolve these issues, we must first determine what obligations the parties' agreements imposed in connection with the acquisition of additional mineral interests. The purchase and participation agreement defines additional mineral interests in pertinent part as "any additional oil, gas or mineral interest or right to acquire such interest covering any portion of the AMI." Conversely, the operating agreement defines the requisite additional interests as "a lease interest, royalty, overriding royalty, or mineral right affecting any lands within the AMI or acquire the right to acquire any such interest (*i.e.,* by farmin)."

Because the operating agreement uses the descriptive term "*i.e.,* by farmin" to modify the phrase regarding the acquisition of "the right to acquire" an additional mineral interest in the AMI, it contains a more restrictive definition of the requisite additional interests than does the purchase and participation agreement. *See U.S. v. King,* 849 F.2d 1259, 1260 (9th Cir.1988) [5] (quoting H.W. Fowler, *A Dictionary of Modern English Usage* 263 (Sir Ernest Gowers, rev. ed., Oxford U. Press 1983)) (other citations omitted); *see also Intel Corp. v. Broadcom Corp.,* 172 F.Supp.2d 478, 495 (D.Del.2001) (mem.); *Redd v. Ingram,* 207 Va. 939, 154 S.E.2d 149, 151 (1967).

■ "[A]greements executed at the same time, with the same purpose, and as part of the same transaction, are construed together." *In re Prudential Ins. Co. of Am.,* 148 S.W.3d 124, 135 (Tex.2004) (orig.proceeding).

Here, both agreements provide that the terms of the purchase and participation agreement control in cases of conflict.

Therefore, the definition of additional mineral interests contained in the purchase and participation agreement controls.

If a party to the agreements acquired such an interest, the operating agreement imposes an obligation on such party to "immediately give written notice thereof to the other parties, together with all pertinent details and information." The operating agreement further provides each of the other parties shall have twenty days after receiving notice to make a written election to "acquire its proportionate interest ... for payment of a like proportion of the acquisition costs."

The O'Sullivan program agreement provides in pertinent part that "each party electing to participate and participating in [an] acquisition shall ... be deemed *the owner of the undivided interest therein* that he or it is entitled to take or has elected to take, as the case may be." (emphasis added). The summary judgment record reflects that McCord initially elected to participate in the purchase of the Perez ranch and in the acquisition of the Sue–Ann lease. McCord provided its proportional share of the purchase money for these acquisitions.

McCord retained its interest in the Sue–Ann lease for approximately three months and its interest in the Perez ranch for approximately five months.

According to the affidavit of Christopher Scully, offered in support of McCord's summary judgment motion, when the Perez ranch and the Sue–Ann lease were acquired,

a percentage of the acquisitions were *assigned to McCord.* When McCord

---

**5.** As the 9th Circuit explained, "The abbreviation '*i.e.* ... introduces another way ... of putting what has been already said. It does not introduce an example, and when substituted for *e.g.* in that function ... is a blunder.'" *U.S. v. King,* 849 F.2d 1259, 1260 (9th Cir.1988) (quoting H.W. Fowler, *A Dictionary of Modern English Usage* 263 (Sir Ernest Gowers, rev. ed., Oxford U. Press 1983)).

elected not to participate in [these] acquisitions, *the McCord interests were reassigned* to the other participants in the O'Sullivan/McCord Joint Venture.... Once [these] interests were reassigned to the other O'Sullivan/McCord Joint Venture participants, McCord *no longer* held an interest in either [of them].

(emphases added).

▮ Accordingly, a genuine issue of material fact remains on the question of whether McCord acquired an "additional oil, gas or mineral interest" within the AMI. Because a fact issue exists on the question of whether McCord acquired an "additional oil, gas or mineral interest" within the AMI and because it is undisputed that McCord failed to give notice of this additional interest to San Saba, we sustain San Saba's first and second issues.

### Fraud Claim

▮ San Saba contends in its third issue that a genuine issue of material fact remains on the question of whether McCord participated in a plan and scheme to defraud San Saba out of this proportional interest. McCord characterizes San Saba's claim as an allegation that McCord conspired with others to breach the parties' agreements, which McCord contends is not an actionable claim.

▮ "Generally, a movant must specially except before urging a motion for summary judgment that alleges a failure to state a claim, thereby giving the plaintiff an opportunity to amend deficient pleadings." *Toles v. Toles,* 113 S.W.3d 899, 909 (Tex.App.-Dallas 2003, no pet.); *accord Friesenhahn v. Ryan,* 960 S.W.2d 656, 658 (Tex.1998); *Salmon v. Miller,* 958 S.W.2d 424, 429 (Tex.App.-Texarkana 1997, pet. denied). Here, McCord did specially except, and the trial court sustained McCord's special exceptions. San Saba

filed its eighth amended petition after this ruling.

▮ We agree with McCord that in Texas a party to a contract may not sue another party to the contract for conspiracy to breach the contract. *See Grizzle v. Tex. Commerce Bank, N.A.,* 38 S.W.3d 265, 284–85 (Tex.App.-Dallas 2001), *rev'd in part on other grounds,* 96 S.W.3d 240 (Tex.2002); *Deaton v. United Mobile Networks, L.P.,* 926 S.W.2d 756, 760–61 (Tex. App.-Texarkana 1996), *rev'd on other grounds,* 939 S.W.2d 146 (Tex.1997); *see also Morgan Stanley & Co. v. Tex. Oil Co.,* 958 S.W.2d 178, 179 (Tex.1997) ("a person must be a stranger to a contract to tortiously interfere with it"); *accord Prudential Ins. Co. of Am. v. Fin. Rev. Servs., Inc.,* 29 S.W.3d 74, 78–79 (Tex.2000); *Grizzle,* 38 S.W.3d at 286.

Here, San Saba alleges that McCord engaged in fraudulent transactions with others "to prevent Plaintiffs from realizing the full interest in the 605 acre lease and minerals to which they were entitled to [sic] under the [operating agreement]." This is nothing more than an allegation that McCord conspired with others to breach the operating agreement. Such a cause of action is not recognized in Texas. *Id.*

Accordingly, we overrule San Saba's third issue.

### Damages

San Saba contends in its fourth issue that a genuine issue of material fact remains on the question of whether it suffered damages as a result of McCord's conduct. McCord responds that: (1) any damages San Saba suffered were caused not by McCord's failure to offer the additional AMI interest to San Saba but by San Saba's failure to take advantage of a later offer by Pursuit Exploration to par-

ticipate in the same interest; (2) San Saba's summary judgment response is deficient because it fails to identify any particular summary judgment evidence to prove causation; and (3) San Saba offered no evidence regarding the proper measure of damages.

In response to the summary judgment motion, San Saba offered several exhibits, including: (1) excerpts from McCord's deposition and supporting documents; and (2) the 15–page affidavit of Jonathan Preston, San Saba's managing general partner.

■ In the traditional portion of McCord's summary judgment motion, McCord contends that any damages suffered by San Saba were caused by its own decision to not accept Pursuit's offer to participate in "the same interest." However, McCord's own summary judgment evidence (also attached to San Saba's response) establishes that Pursuit took an assignment of only the oil and gas below 9,765 feet, while the Sue–Ann lease earlier assigned to O'Sullivan included the oil and gas both above and below that depth. Thus, Pursuit did not (and could not) offer San Saba an opportunity to participate in the *same* interest. Accordingly, McCord failed to conclusively negate the causation element of San Saba's breach-of-contract claim. *See IHS Cedars Treatment Ctr. of Desoto v. Mason,* 143 S.W.3d 794, 798 (Tex.2004).

With respect to the no-evidence portion of the summary judgment motion, McCord contends that San Saba failed to present any evidence in response to its assertion that San Saba could produce no evidence of causation because San Saba failed to direct the trial court "to any specific evidence."

As set out above however, San Saba attached excerpts from McCord's deposition which show that Pursuit did not (and could not) offer San Saba an opportunity to participate in the *same* interest which McCord earlier acquired through O'Sullivan. Thus, San Saba produced more than a scintilla of evidence to establish causation. *See Ford Motor Co. v. Ridgway,* 135 S.W.3d 598, 600 (Tex.2004).

Preston's affidavit provides more than a scintilla of evidence regarding the profits San Saba lost as a result of McCord's failure to offer it a proportional interest in the Perez ranch and the Sue–Ann lease. *See Abraxas Petroleum Corp. v. Hornburg,* 20 S.W.3d 741, 759–61 (Tex.App.-El Paso 2000, no pet.).

Accordingly, we sustain San Saba's fourth issue.

We affirm the judgment as to San Saba's fraud claim, reverse the judgment as to San Saba's breach of contract claim, and remand this cause to the trial court for further proceedings.