Erika Amey, Individually and d/b/a Erika's Emporium and Pam New v. Barrera


















NUMBER 13-01-00130-CV

COURT OF APPEALS

THIRTEENTH DISTRICT OF TEXAS

CORPUS CHRISTI – EDINBURG
                                                                                                                      

ERIKA AMEY, INDIVIDUALLY AND D/B/A
ERIKA’S EMPORIUM, AND PAM NEW,                            Appellants,

v.

MIRELLA BARRERA AND SENOVIO BARRERA,                    Appellees.
                                                                                                                      

On appeal from the 148th District Court of Nueces County, Texas.
                                                                                                                      

MEMORANDUM OPINION

Before Chief Justice Valdez and Justices Hinojosa and Rodriguez
Memorandum Opinion by Justice Hinojosa
 
          Appellants, Erika Amey, individually and d/b/a Erika’s Emporium (“Amey”), and Pam
New (“New”), appeal from the trial court’s judgment finding them jointly and severally liable
for conspiracy, tortious interference with contractual relations, fraud, violation of the Texas
Deceptive Practices–Consumer Protection Act (“DTPA”), and violation of a non-competition
agreement. The judgment granted a permanent injunction and awarded actual and
punitive damages to appellees, Mirella Barrera and Senovio Barrera (“the Barreras”). By
twenty-three issues, appellants contend the trial court erred by:
(1)      denying Amey’s special exceptions to the Barreras’ pleadings;
 
(2)      denying Amey’s motion to file an amended answer with affirmative defenses and
a counter-claim;
 
(3)      failing to identify in the final order a specific theory of recovery for its award of actual
damages, punitive damages, injunctive relief, and holding Amey and New jointly and
severally liable;
 
(4)      entering the judgment against Amey and New, jointly and severally;
 
(5)      entering judgment and awarding actual and punitive damages and injunctive relief
for (a) fraud, (b) breach of the non-compete agreement, (c) soliciting contracts, (d)
tortious interference with the Barreras’ existing contracts, (e) conspiracy, and (f)
conspiracy to tortiously interfere;
 
(6)      entering judgment for violations of the DTPA;
 
(7)      awarding damages for (a) lost profits, (b) future damages, and (c) emotional
distress;
 
(8)      awarding the Barreras recovery of their trial attorneys’ fees;
 
(9)      awarding the Barreras their appellate attorneys’ fees;
 
(10)    awarding punitive damages;
 
(11)    granting a permanent injunction enjoining Amey from “doing any business with any
customers of Colonial Flowers that were existing account customers of Colonial
Flowers on June 23, 1999;”
 
(12)    awarding the Barreras both monetary damages and a permanent injunction;
 
(13)    issuing the writ of injunction;
 
(14)    excluding Jim New from the courtroom during the trial and presentation of evidence;
 
(15)    denying Amey’s motion for new trial; and
 
(16)    denying appellants’ request for a judgment that the Barreras take nothing against
them.



We reverse and render.
I. The Barreras’ Cross-Appeal
          In their cross-appeal, the Barreras have raised two cross-issues. They contend the
trial court erred by: (1) not allowing their counsel to reopen on appellate attorneys’ fees
as the prevailing party and (2) not awarding treble damages against Amey and New for
violating the DTPA. The Barreras have failed to present any argument or authority on
either issue. See Tex. R. App. P. 38.1 (h). Furthermore, the Barreras did not file a notice
of appeal. See Tex. R. App. P. 25.1(c) (“A party who seeks to alter the trial court’s
judgment or other appealable order must file a notice of appeal. . . . The appellate court
may not grant a party who does not file a notice of appeal more favorable relief than did
the trial court except for just cause.”). We hold the Barreras have waived appellate review
of their two cross-issues. Accordingly, the Barreras’ two cross-issues are overruled.
II. Background
          The record reflects that New owned and operated Colonial Flowers (“Colonial”) in
Corpus Christi for fifteen years. New had been in the floral business for over thirty-five
years. In 1994, Amey began visiting Colonial on a daily basis because her bank and
beauty parlor were in the same shopping center as Colonial. It was during these visits that
New and Amey became acquainted.
          In 1999, the Barreras heard from a floral wholesaler that New was considering
selling Colonial. The Barreras owned Artistic Flowers in nearby Portland. New sent Mirella
Barrera a letter “regarding the sale of Colonial Flowers,” and detailed some facts about the
shop. After setting out information regarding Colonial’s landlord, rent, electric bills, lighted
sign, and van, New’s letter stated:
We have a large inventory of stuffed animals, baskets, balloons, inventory
in front area, 2 design tables 4x8, sales counter, order table in work roon
[sic], water heater and a 8x10 foot ice box with a double brass glass display
window and door in front.
 
We have the gift shop accounts for Spohn DT, Spohn South, Drs. and Bay
Area. These accounts run about 4500.00 per month. They are demanding
at times but get a good turn over in flowers.
  
Accounts receivable will go with the shop except for the FTD, Teleflora and
AFS check for the last month. Also the hospital checks for last month will be
mine.
 
We are interested in closing either the end of April or the end of June.
 
GROSS SALES FOR 1998 were $203,000.00. If you are interested give me
and [sic] call and you can come look us over. We are asking $50,000.00 for
the things listed above. I will keep flowers and plants in the shop also. Oh
yes, I forgot ribbon there is tons of it. 
 
Thanks, 
 
Jim and Pam New 
 
On June 23, 1999, the Barreras purchased Colonial from New for $25,000.00. The
purchase agreement stated:
On this 23rd day of June, 1999, Mirella Barrera and Senovio Barrera will
purchase the business Colonial Flowers located at 6410 Weber, Corpus
Christi, Texas. This purchase includes all clientele, fixtures and vehicles of
said business. Purchase price is twenty-five thousand dollars ($25,000)
payable to Pam New the current owner. 
 
The purchase agreement was signed only by New. At the bottom of the typed agreement,
New handwrote: 
I, Pam New, will not do any floral business in Corpus Christi or surrounding
area for 5 years.
 
/s/ Pam New
 
New’s employee, Tina Yeoman, also handwrote on the agreement, “I, Tina C. Yeoman, will
not open my own floral business for five years.”
          After the sale of Colonial, New continued to visit the shop regularly to help Edna
Canas (“Canas”), an employee hired by the Barreras and the floral designer at Colonial,
with arrangements, orders, sending bills and other matters. Canas was recommended to
the Barreras by New. New introduced Canas and Karla Havel, the floral designer at
Artistic, to some of Colonial’s customers and to the hospital gift shop’s personnel at Bay
Area, Doctor’s Regional Medical, Spohn, and Spohn South. New instructed Canas on
preparing arrangements to Colonial customer specifications and trained her on billing.
          New and her husband, Jim New, moved to San Antonio in July 1999. When they
visited Corpus Christi, the News went to Colonial and helped the Barreras through the first
of December, 1999.
          On September 2, 1999, Amey, as sole owner, filed an assumed name certificate to
do business in Nueces County as Erika’s Emporium (“the Emporium”). On November 1,
1999, Amey opened the Emporium in Corpus Christi, just a few blocks from Colonial. 
When the Emporium opened, Amey had no established customers. Amey followed
recommendations from a floral magazine; weekly, she delivered flyers and complimentary
arrangements, with her business card, to businesses, schools, beauty salons, and
restaurants. Amey left her business card with all of the schools, funeral homes, and
hospitals in Corpus Christi. Amey also advertised on radio and television.
          New first became aware that Amey had opened the flower shop on December 10,
1999. In early 2000, New drove in from San Antonio and decided to visit Amey at the
Emporium. New visited Amey once every one or two months and stayed for an hour or
two, generally spending the time on the phone with friends. In August 2000, New began
visiting Amey once every three months. On three separate occasions New brought her
own flowers and supplies and used a table at the Emporium to assemble: (a) one floral
arrangement for a friend with a newborn baby; (b) one arrangement for a friend’s funeral;
and (c) one arrangement for a graduation. In 2000, Jim New assisted Amey in delivering
flowers on Valentine’s Day.
          Also, in the latter part of 1999, Canas started having problems with the Barreras. 
She left her employment with them on December 21, 1999. In January, February, and
March 2000, Canas did some work at the Emporium on an as needed basis. In April 2000,
Amey hired Canas as a full time employee.
          On or about February 2000, the Barreras lost the hospital gift shop accounts of
Doctor’s Regional Medical Center and Bay Area Medical Center to the Emporium. Colonial
also lost the London Independent School District Valentine’s Day sale, the Carroll High
School Football Mum sale, Dr. Villarreal’s account, and Kathy Pickett’s account to the
Emporium. 
          On March 20, 2000, the Barreras filed suit against New and Amey, individually and
d/b/a Erika’s Emporium in Nueces County. They alleged that although New had agreed
not to do any floral business in Corpus Christi for five years,
New has returned to the floral business and is working for Erika Amey at
Erika’s Emporium. Pam and Erika at Erika’s Emporium have stolen certain
accounts that were the accounts of Colonial Flowers at the time [the
Barreras] purchased Colonial Flowers from [New].
 
The Barreras further alleged that New and/or Amey through Erika’s Emporium had: (1)
violated the non-competition agreement; (2) interfered with the contractual relations of
Colonial Flowers with Bay Area Hospital Gift Shop, Doctor’s Regional Hospital Gift Shop,
Dr. Villarreal, Bette Bernson, Kathy Pickett, London Independent School District and
others; and (3) engaged in conspiracy and/or fraud. The Barreras asked the court to enjoin
New and Amey from further selling flowers to the Barreras’ customers. The trial court
granted a temporary restraining order on March 20, 2000, and after a hearing on April 4,
2000, the court signed a temporary injunction against New. 
          Later, after a bench trial, the trial court found that New and Amey, individually and
d/b/a Erika’s Emporium, were liable for conspiracy, tortious interference with contractual
relations, fraud, violation of the DTPA, and violation of the non-competition agreement. 
The court granted a permanent injunction against New and Amey, individually and d/b/a
Erika’s Emporium, enjoining them, their agents, employees, and servants from doing any
business with any customers of Colonial that were customers of Colonial on June 23, 1999. 
The court also found that New and Amey, individually and d/b/a Erika’s Emporium, were
jointly and severally liable for the following damages: (1) $10,612.25 for conspiracy,
tortious interference with contractual relations, fraud, violation of the DTPA, and breach of
the non-competition agreement; (2) $10,000.00 for mental anguish; (3) $2,000.00 for
damages incurred in December 2000, and $2,000.00 for each month thereafter until the
judgment was signed; (4) $10,000.00 for attorneys’ fees and expenses incurred during trial;
(5) $10,000.00 for attorneys’ fees incurred on appeal to the court of appeals; and (6) costs
of court. The court also assessed punitive damages in the amount of $10,000.00 against
New, and $5,000.00 against Amey.
III. Sufficiency of the Evidence
          In Amey’s fifth through eleventh issues, and in New’s third through ninth issues,
appellants contend the evidence is legally and factually insufficient to support the trial
court’s judgment for fraud, breach of the non-compete agreement, tortious interference,
conspiracy, conspiracy to tortiously interfere, and violation of the DTPA.
A. Standard of Review
          When no findings of fact or conclusions of law were requested or filed, we imply all
necessary findings in support of the trial court’s judgment. Holt Atherton Indus., Inc. v.
Heine, 835 S.W.2d 80, 83 (Tex. 1992); Worford v. Stamper, 801 S.W.2d 108, 109 (Tex.
1990). If a reporter’s record is included in the record on appeal, the implied findings may
be challenged for legal and factual sufficiency. See Roberson v. Robinson, 768 S.W.2d
280, 281 (Tex. 1989) (per curiam). 
          When, as here, both legal and factual sufficiency issues are raised, we must first
review the legal sufficiency to determine if there is any evidence of probative value to
support the trial court’s findings. Glover v. Tex. Gen. Indem. Co., 619 S.W.2d 400, 401
(Tex. 1981). In a bench trial, the trial judge passes on the witnesses’ credibility and the
weight given their testimony, and can reject or accept any witness’s testimony in whole or
in part. Bocquet v. Herring, 972 S.W.2d 19, 22 (Tex. 1998); In re Cummings, 13 S.W.3d
472, 476 (Tex. App.–Corpus Christi 2000, no pet.). When the record contains conflicting
testimony, the appellate court must defer to the determination of the trial court, who is the
sole judge of the credibility of the witnesses. Maeberry v. Gayle, 955 S.W.2d 875, 880
(Tex. App.–Corpus Christi 1997, no pet.). 
          When we review a legal sufficiency or “no evidence” issue, we must view the
evidence in a light that tends to support the finding of the disputed fact and disregard all
evidence and inferences to the contrary. Bradford v. Vento, 48 S.W.3d 749, 754 (Tex.
2001). A no evidence issue will be sustained when the record discloses that: (1) there is
a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of
evidence from giving weight to the only evidence offered to prove a vital fact; (3) the
evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence
conclusively establishes the opposite of the vital fact. Merrell Dow Pharms. v. Havner, 953
S.W.2d 706, 711 (Tex. 1997). If there is more than a scintilla of evidence to support the
finding, the no evidence challenge fails. Holt Atherton Indus., 835 S.W.2d at 84. When
the evidence offered to prove a vital fact is so weak as to do no more than create a mere
surmise or suspicion of its existence, the evidence is not more than a scintilla and, in legal
effect, is no evidence. Kindred v. Con-Chem, Inc., 650 S.W.2d 61, 63 (Tex. 1983). More
than a scintilla of evidence exists where the evidence supporting the finding, as a whole,
rises to a level that would enable reasonable and fair-minded people to differ in their
conclusions. Havner, 953 S.W.2d at 711.
                                                     B. Conspiracy
          The Barreras assert that appellants engaged in a conspiracy through the Emporium
because appellants knew that New had a legal obligation not to sell flowers or engage in
any type of floral business in Corpus Christi, or the surrounding area, yet they continuously
and repeatedly engaged in the floral business, to the detriment of the Barreras.
          A civil conspiracy is a combination by two or more persons to accomplish an
unlawful purpose or to accomplish a lawful purpose by unlawful means. Triplex
Communications, Inc. v. Riley, 900 S.W.2d 716, 719 (Tex. 1995). Civil conspiracy requires
specific intent, that is, the parties must be aware of the harm or wrongdoing at the
inception of the combination or agreement. Id. The elements of civil conspiracy are: (1)
two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the
object or course of action; (4) one or more unlawful, overt acts; and (5) damages as a
proximate result. Operation Rescue-Nat’l v. Planned Parenthood of Houston & Southeast
Tex., Inc., 975 S.W.2d 546, 553 (Tex. 1998). The meeting of the minds element requires
knowledge of the course of action and specific intent. See Triplex Communications, 900
S.W.2d at 719. To show specific intent, a plaintiff must show that the parties were aware
of the harm or wrongdoing at the inception of the combination or agreement. Id. 
C. Covenant Not to Compete
          At trial, the Barreras alleged that their causes of action formed the basis of the
conspiracy. On appeal, the Barreras mainly contend that the breach of the non-compete
agreement is the unlawful purpose or means that forms the basis of their conspiracy
allegation. Accordingly, we must first determine whether there has been a breach of the
non-compete agreement, and second, whether a breach of that agreement can form the
basis of the conspiracy, i.e., whether some tort has been shown to exist.
 
                                                     1. The Covenant
          The criteria for enforceability of covenants not to compete are set forth in section
15.50 of the Texas Business and Commerce Code. That statute provides:
[A] covenant not to compete is enforceable if it is ancillary to or part of an
otherwise enforceable agreement at the time the agreement is made to the
extent that it contains limitations as to time, geographical area, and scope of
activity to be restrained that are reasonable and do not impose a greater
restraint than is necessary to protect the goodwill or other business interest
of the promisee.
 
Tex. Bus. & Com. Code Ann. § 15.50(a) (Vernon 2002). The enforceability of a covenant
not to compete, including the question of whether a covenant not to compete is a
reasonable restraint of trade, is a question of law for the court. Light v. Centel Cellular Co.,
883 S.W.2d 642, 644 (Tex. 1994). We review questions of law de novo. In re Humphreys,
880 S.W.2d 402, 404 (Tex. 1994). A third party cannot in any manner interfere with
contractual obligations or covenants. Wells v. Powers, 354 S.W.2d 651, 654 (Tex. Civ.
App.–Dallas 1962, no writ). The interest in a contract being a property right, a party thereto
has a right of action against persons who are by their conduct substantially interfering with
the performance thereof. Id. 
          Parties enter into a binding contract when the following elements exist: (1) an offer;
(2) an acceptance in strict compliance with the terms of the offer; (3) a meeting of the
minds; (4) each party’s consent to the terms; and (5) execution and delivery of the contract 
with the intent that it be mutual and binding. Copeland v. Alsobrook, 3 S.W.3d 598, 604
(Tex. App.–San Antonio 1999, pet. denied). 
          The purchase agreement between the Barreras and New shows that the Barreras
agreed to purchase Colonial, including all clientele, fixtures, and vehicles of the business,
from New for $25,000.00. After the purchase agreement was typed, the Barreras asked
that New include a statement that she would not compete with Colonial, and New wrote at
the bottom of the agreement that she “[would] not do any floral business in Corpus Christi
or surrounding area for 5 years.”
          After reviewing the record, we conclude that the purchase agreement between the
Barreras and New is an enforceable agreement, to which the non-compete agreement is
ancillary and contains reasonable limitations as to time, geographical area, and scope of
activity to be restrained. Therefore, the covenant not to compete is enforceable against
New.
          We next determine whether the evidence is legally sufficient to show that: (1) New
breached the covenant; (2) Amey interfered with the covenant between New and the
Barreras; or (3) there was a conspiracy between Amey and New to breach the covenant. 
The Barreras assert that: (1) New has returned to the floral business and is working for
Amey at the Emporium; and (2) Amey and New have stolen accounts that were the
accounts of Colonial at the time that the Barreras purchased Colonial from New.
          The evidence established that New sold Colonial to the Barreras in June 1999, and
moved to San Antonio in July 1999. As part of the sale, the Barreras received New’s client
list.


 To help in the transition, New introduced the Barreras to some of her customers and
helped train Canas to prepare floral arrangements according to Colonial customer
specifications. New also returned to Corpus Christi at least once a month and stopped by
the shop. While there, she helped with the billing and orders. New even spent a week
during Homecoming, helping the Barreras put together mums for Carroll High School. On
one occasion, Renee Jalomo (“Jalomo”), a Colonial employee, overheard New tell
someone on the telephone that the quality of flowers at Colonial was bad. After that,
Mirella Barrera told Jalomo and Canas not to leave New alone at Colonial. 
          When New owned Colonial, Amey would stop by the shop on a daily basis. In
September 1999, Amey filed an assumed name certificate to open Erika’s Emporium. The
Emporium’s first month of business was November 1999. New did not learn of the
Emporium’s opening until December 10, 1999. After the Emporium opened, Senovio
Barrera went by and offered his assistance to Amey, as a fellow flower shop owner. During
the conversation, Amey told him that she knew Colonial had the gift shop accounts at
Spohn and Spohn South hospitals. She also said that she had gone by the gift shops and
introduced herself as a friend of New, and that she was going to try to get the accounts.


 
Amey admitted that she used New’s name when she went to solicit Spohn South’s
business. In February 2000, Jim New helped Amey deliver flowers for Valentine’s Day. 
After Amey opened the Emporium, New went to the Emporium when she was in Corpus
Christi; she no longer went to Colonial. On three separate occasions, New went to the
Emporium and created arrangements for friends with flowers and materials she had
brought with her.
          At the end of December 1999, after a disagreement with Mirella Barrera, Canas left
Colonial. She worked as a part-time employee at the Emporium during the months of
January, February, and March 2000, and became a full-time employee in April 2000. 
          In February 2000, Colonial received a letter from Susan Tiller (“Tiller”), executive
director of the Corpus Christi Area Council for the Deaf, cancelling the orders for the gift
shops at Doctor’s Regional Hospital and Bay Area Hospital.


 Colonial had serviced these
accounts for at least fourteen years. The gift shops began using the Emporium in March
2000. Tiller testified that the decision to leave Colonial was based on gift-shop volunteer
complaints that Colonial’s flowers were dying and they needed to be replaced, and the
volunteers were displeased with some of the baby wreaths Colonial had delivered to the
gift shops. Tiller had Joan Goudan, a gift shop manager, and Patricia Harman, a gift shop
worker and New’s friend, investigate and determine how to handle the situation. Harman
informed Tiller that they had decided to try another flower shop. 
          The Barreras also contend that Amey and New took other customers away from
Colonial. The Barreras alleged that Kathy Pickett had ordered approximately three
arrangements per month. However, Pickett testified that she only ordered on an as
needed basis, and that she had only ordered three arrangements in the last six months.
Pickett said she had switched to the Emporium because Edna Canas had moved there. 
Pickett testified she had become dissatisfied with Colonial’s service after they delivered
some flowers she had ordered to the wrong address, and they made an arrangement for
her birthday, which her daughter had ordered, that was not to her daughter’s specifications. 
She stated that she had not done business with Colonial since about February 2000. 
Pickett had also been New’s friend since 1974.
          New called Colonial to get Bette Bernson’s phone number, and Jim New went by
and picked up the funeral urn for Bernson’s daughter’s grave. Colonial had been providing
flowers for the grave site, but at the time of trial, Bernson had not ordered flowers for a
couple of months. Bernson did not move her account to the Emporium. 
          Dr. Villarreal’s office, which had ordered bud vases for patients from Colonial, began
purchasing from the Emporium in February 2000, after Mrs. Villarreal saw one of Canas’
arrangements at her hair salon. 
          In February 2000, London Independent School District called Colonial to get a bid
for five hundred carnations for the student council’s Valentine’s Day sale. The District
subsequently informed Colonial that it had been able to get a cheaper price at the
Emporium.
          For approximately fifteen years, while New owned the shop, Carroll High School
ordered from 75 to 100 homecoming mums from Colonial. After New sold the shop in
1999, Carroll only ordered 25 mums from Colonial, because Carroll had decided to try
other florists. In 2000, Carroll ordered 25 mums from the Emporium.
          After reviewing the evidence in a light that tends to support the finding of an
interference of the covenant not to compete, and disregarding all evidence and inferences
to the contrary, we conclude there is no more than a mere scintilla of evidence to establish
that New breached the covenant or that Amey interfered with the covenant. Accordingly,
we hold the evidence is legally insufficient to support the trial court’s finding that appellants
breached the covenant not to compete.
                                                                2. Conspiracy to Breach Covenant
          Breach of contract is by definition actionable, but breach of contract is not a tort. 
Deaton v. United Mobile Networks, L.P., 926 S.W.2d 756, 760 (Tex. App.–Texarkana
1996), aff’d in part & rev’d in part on other grounds, 939 S.W.2d 146 (Tex. 1997). The
principles of tort and contract law are well-settled, but it is often difficult to draw a bright line
between which type of action a party brings. See Jim Walter Homes, Inc. v. Reed, 711
S.W.2d 617, 617 (Tex. 1986). A party’s actions may breach duties in tort, contract, or both. 
Id. at 618. It has long been the rule in Texas that “mere nonfeasance under a contract”
only creates liability for breach of contract. Crawford v. Ace Sign, Inc., 917 S.W.2d 12, 13
(Tex. 1996). Generally, in analyzing a case’s characterization as a contract or a tort cause
of action, we first look to the source of the defendant’s duty to act. Southwestern Bell Tel.
Co. v. DeLanney, 809 S.W.2d 493, 494 (Tex. 1991).
Tort obligations are in general obligations that are imposed by law – apart
from and independent of promises made and therefore apart from the
manifested intention of the parties – to avoid injury to others. If the
defendant’s conduct . . . would give rise to liability independent of the fact
that a contract exists between the parties, the plaintiff’s claim may also
sound in tort. Conversely, if the defendant’s conduct . . . would give rise to
liability only because it breaches the parties’ agreement, the plaintiff’s claim
ordinarily sounds only in contract.
 
Id. In determining the type of action brought, we look to the substance of the cause of
action rather than the manner in which the party pleaded the action. Reed, 711 S.W.2d
at 617-18.
          We must also consider the nature of the remedy or damages sought by the plaintiff. 
DeLanney, 809 S.W.2d at 494. The nature of the injury most often determines whether
a contract duty, tort duty, or both have been breached. Id. at 495 (citing Reed, 711 S.W.2d
at 618). When the damage goes only to the subject matter of the contract, the action is
ordinarily on the contract. Id. However, when the loss or damage is not the subject of the
contract, the action is one in tort. See Farah v. Mafrige & Kormanik, P.C., 927 S.W.2d 663,
674 (Tex. App.–Houston [1st Dist.] 1996, no writ).
          After reviewing the record and concluding that there is no more than a scintilla of
evidence that New breached the purchase agreement’s covenant not to compete or that
Amey interfered with the covenant not to compete, and that a breach of the covenant
would be a breach of contract, we conclude that it will not support a civil conspiracy. 
Accordingly, we hold the evidence is legally insufficient to show that New breached the
covenant not to compete or conspired to breach the covenant not to compete. We further
hold the evidence is legally insufficient to show that Amey interfered with the covenant not
to compete or conspired to interfere with the covenant not to compete.
D. Tortious Interference with Existing Contracts
          The Barreras also contend that although appellants knew Colonial had ongoing
contracts with Bay Area Hospital Gift Shop, Doctor’s Regional Hospital Gift Shop, Dr.
Villarreal, Bette Bernson, Kathy Pickett, London Independent School District, and others,
New and Amey “knowingly and intentionally illegally interrupted the contract between
Colonial and the third parties.” Appellants assert there were no contracts between Colonial
and these third parties.
          To succeed on a claim for tortious interference with an existing contract, the
Barreras must show: (1) an existing contract subject to interference; (2) a wilful and
intentional act of interference with the contract; (3) that proximately caused the Barreras’
injury; and (4) caused the Barreras’ actual damage or loss. See Prudential Ins. Co. of Am.
v. Fin. Review Servs., Inc., 29 S.W.3d 74, 77 (Tex. 2000). Interference with a contract
rises to a tortious level only when it is intentional. ACS Investors, Inc. v. McLaughlin, 913
S.W.2d 664, 672 (Tex. App.–Dallas 1995), rev’d on other grounds, 943 S.W.2d 426 (Tex.
1997). There must be some direct evidence of a wilful act of interference. Browning-Ferris, Inc. v. Reyna, 865 S.W.2d 925, 927 (Tex. 1993).
          When New sold Colonial to the Barreras, the customer accounts at Colonial were
included in the sale. Senovio Barrera admitted that Colonial did not have contracts with
the hospitals “per se;” the hospitals only had accounts with Colonial. Tiller and Harmon
testified that the gift shops at Doctor’s Regional and Bay Area did not have contracts with
Colonial, and they do not now have a contract with the Emporium. According to Harmon,
the gift shops would continue buying from a flower shop vendor, as long as the gift shops
were happy with the quality of flowers and the service; the gift shops could change vendors
at any time.
          Yolanda Villarreal testified that Dr. Villarreal’s office did not have a contract with any
of the florists from whom they purchased flowers for their patients. Pickett also testified
that she was not under a contract with Colonial and was free to take her business wherever
she wanted. Mirella Barrera testified that her customers were free to buy from any flower
shop.
          After reviewing the evidence, we conclude there were no contracts subject to
interference. The situation in this case is simply that of competition in the floral business. 
As the supreme court stated in Delz v. Winfree: 
Everyone has a right to enjoy the fruits and advantages of his own
enterprise, industry, skill, and credit. He has no right to be protected against
competition; but he has a right to be free from a malicious and wanton
interference, disturbance, or annoyance. If disturbance or loss come as a
result of competition, or the exercise of like rights by others, it is damnum
absque injuria, unless some superior right by contract or otherwise is
interfered with. But if it come from the merely wanton or malicious acts of
others, without the justification of competition or the service of any interest
or lawful purpose, it then stands upon a different footing.
 
Delz v. Winfree, 80 Tex. 400, 405, 16 S.W. 111 (1891). The supreme court has recently
stated:
It is one thing for A and B to compete for C’s business, and quite another for
A to persuade or force C to break his contract with B. Tortious interference
with contract contemplates that competition may be lawful and yet limited by
promises already made. Absent any such promises, competitors should be
free to use any lawful means to obtain advantage. As one commentator has
observed:
 
Although one who interferes with the stability of a contractual
relationship may be seen as an interloper and possibly a
tortfeasor, one who interferes merely with a “prospective
business advantage” may be essentially a competitor. In an
economic system founded upon the principle of free
competition, competitors should not be liable in tort for seeking
a legitimate business advantage.
 
Wal-Mart Stores, Inc. v. Sturges, 52 S.W.3d 711, 716-17 (Tex. 2001) (quoting Gary
Meyers, The Differing Treatment of Efficiency and Competition in Antitrust and Tortious
Interference Law, 77 Minn. L. Rev. 1097, 1121-22 (1993)).
          After reviewing the record, we find no evidence that contracts existed between
Colonial and its customers. We conclude the Barreras’ complaint is based solely on a loss
of business through competition, and is a result of their participation in the free enterprise
system. Therefore, we hold the evidence is legally insufficient to prove that Amey and New
tortiously interfered with Colonial’s alleged contracts, or that Amey and New conspired to
tortiously interfere with the alleged contracts.
E. Fraud
          The Barreras contend appellants committed fraud through the Emporium, because
New never intended to honor the purchase agreement’s covenant not to compete, and
New and Amey conspired to undermine the success of Colonial once it was purchased by
the Barreras. 
          The elements of fraud are: (1) a material representation was made; (2) the
representation was false; (3) when the representation was made, the speaker knew it was
false or made it recklessly without any knowledge of the truth and as a positive assertion;
(4) the speaker made the representation with the intent that the other party should act upon
it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered
injury. In re Firstmerit Bank, N.A., 52 S.W.3d 749, 758 (Tex. 2001). 
          Before New sold Colonial to the Barreras, Amey offered to buy Colonial, but New
refused because she did not take Amey’s interest seriously, and she did not know that
Amey wanted to go into the flower business. As part of the transition, New introduced the
Barreras to some of her customers and helped train Canas to make floral arrangements
according to the specifications of Colonial customers. New did not mind signing the
purchase agreement’s covenant not to compete because she was moving to San Antonio. 
New also returned to Corpus Christi at least once a month and stopped by the shop, and
while there she helped with the billing and orders. New even spent a week during
Homecoming helping the Barreras put together mums for Carroll High School. 
          Amey opened the Emporium at a location that New had used for Colonial before
New moved Colonial to its present location. Although the shop location had been occupied
by other tenants, it still had the requisite refrigeration units for a floral shop. Amey called
Jim New in December 1999, to ask about the refrigeration units’ wiring because Jim had
constructed the units. It was at that time that New learned that Amey had opened the
Emporium. After learning of the Emporium’s opening, New started going there when she
was in Corpus Christi.
          After reviewing the record, we conclude the material representation is the non-compete agreement signed by New in the purchase agreement. However, we find no
evidence in the record that the representation was false when the representation was
made, or that New knew it was false or made it recklessly without any knowledge of the
truth and as a positive assertion. The evidence establishes that New signed the non-compete agreement because she was moving to San Antonio and did not plan to return
to Corpus Christi, except to visit. Furthermore, New and Amey could not have conspired
to breach the agreement by opening the Emporium because New did not know anything
about the Emporium until a couple of months after the shop was opened. Therefore, we
hold the record contains no evidence of a fraud committed by appellants, or of a
conspiracy to commit fraud by New and Amey.
F. Violations of the DTPA
          The Barreras contend that appellants engaged in conduct in violation of the DTPA
because Amey and New have: (1) caused confusion or misunderstanding as to the
source, sponsorship, approval, or certification of goods or services; (2) caused confusion
or misunderstanding as to the affiliation, connection or association with, or certification by,
another; (3) represented that an agreement confers or involves rights, remedies, or
obligations which it did not have or involve; (4) disparaged the goods and services of the
Barreras’ business by false or misleading representation of facts; and (5) advertised goods
with the intent not to sell them as advertised. See Tex. Bus. & Com. Code Ann. § 17.46
(b)(2), (3), (8), (9), (12) (Vernon Supp. 2004). Specifically, the Barreras contend that: (1)
New misrepresented certain accounts belonged to Colonial and agreed not to engage in
the floral business; (2) Amey attempted to steal Colonial’s accounts using New’s name; (3)
Amey and New disparaged Colonial’s flowers; (4) New and Amey sabotaged Colonial’s
business through Canas; and (5) New sold Colonial with the intent not to sell it as
advertised. Appellants contend the Barreras are not consumers and cannot assert a DTPA
claim.
          The elements of a DTPA “laundry list” cause of action are: (1) the plaintiff is a
consumer; (2) the defendant engaged in a false, misleading, or deceptive act or practice;
(3) that was relied on by the consumer; and (4) that constituted a producing cause of the
consumer’s actual damages. Tex. Bus. & Com. Code Ann. § 17.50 (a)(1) (Vernon 2002). 
To prove an action for a violation of the DTPA, the plaintiff must establish its status as a
consumer. Eckman v. Centennial Sav. Bank, 784 S.W.2d 672, 674 (Tex. 1990). Proving
standing under the DTPA requires demonstration of three elements, the plaintiff was (1)
a consumer that (2) sought or acquired, by purchase or lease, (3) goods or services. Tex.
Bus. & Com. Code Ann. § 17.45 (4) (Vernon 2002); Amstadt v. United States Brass Corp.,
919 S.W.2d 644, 649 (Tex. 1996).


 To qualify as a consumer under the DTPA, two
requirements must be established by the plaintiff: (1) the person must have sought or
acquired goods or services by purchase or lease; and (2) the goods or services purchased
or leased must form the basis of the complaint. Cameron v. Terrell & Garrett, 618 S.W.2d
535, 539 (Tex. 1981); Riverside Nat’l Bank v. Lewis, 603 S.W.2d 169, 174-75 (Tex. 1980). 
If either requirement is lacking, the person aggrieved by a deceptive act or practice must
look to the common law or some other statutory provision for redress. Cameron, 618
S.W.2d at 539; Lewis, 603 S.W.2d at 175. 
          The DTPA statute requires us to liberally construe it to protect consumers from
false, misleading, and deceptive business practices. Tex. Bus. & Com. Code Ann. §
17.44(a) (Vernon 2002); Kennedy v. Sale, 689 S.W.2d 890, 892 (Tex. 1985). The DTPA
defines a “consumer” as “an individual . . . who seeks or acquires by purchase or lease,
any goods or services.” Tex. Bus. & Com. Code Ann. § 17.45(4) (Vernon 2002). Goods
are defined as “tangible chattels or real property purchased or leased for use.” Tex. Bus.
& Com. Code Ann. § 17.45(1) (Vernon 2002). Tangible property includes both real and
personal property. Wheeler v. Box, 671 S.W.2d 75, 77 (Tex. App.–Dallas 1984, no writ). 
Tangible property is commonly understood to be property that is capable of being handled
or touched. Id.
          The DTPA excludes transactions that convey wholly intangible rights, such as
money or accounts receivable, that are not associated with any collateral services. See
Lewis, 603 S.W.2d at 174-75; Clary Corp. v. Smith, 949 S.W.2d 452, 464 (Tex. App.–Forth
Worth 1997, pet. denied). Generally, a business is an intangible, unless it encompasses
goods or services purchased for use in the function of the business. Clary Corp., 949
S.W.2d at 464; Wheeler, 671 S.W.2d at 78-79. 
          In this case, the Barreras did not purchase the mere intangible right to sell flowers
under the name “Colonial Flowers.” The purchase of the flower shop encompassed both
the shop’s intangible existing business name, as well as the shop’s tangible physical
assets, consisting of the equipment, inventory, and delivery van. We hold this transaction
qualified as one for “goods and services,” thereby satisfying the first requirement to qualify
as a consumer. We must now address whether the Barreras satisfy the second
requirement, i.e., whether the goods or services purchased or leased form the basis of the
Barreras’ complaints. 
          The representation that forms the basis of the Barreras’ claim involves the accounts
represented during the purchase of Colonial. They contend that New misrepresented
these accounts, Amey attempted to steal these accounts, and New never intended to
convey these accounts as advertised. However, these accounts do not constitute goods
or services as defined by statute. See Tex. Bus. & Com. Code Ann. § 17.45(1) (Vernon
2002); Snyders Smart Shop, Inc. v. Santi, Inc., 590 S.W.2d 167, 170 (Tex. Civ.
App.–Corpus Christi 1981, no writ). Therefore, we hold the Barreras were not consumers
under the provisions of the DTPA.
          Accordingly, we hold the evidence is legally insufficient to support the trial court’s
findings that appellants violated the DTPA. 
IV. Conclusion
          We hold the evidence is legally insufficient to support the trial court’s findings that
appellants engaged in a civil conspiracy, committed fraud, breached the non-compete
agreement signed between New and the Barreras, tortiously interfered or engaged in a
conspiracy to tortiously interfere with the Barreras’ contracts with its existing customers,
and violated the DTPA. Accordingly, we sustain Amey’s fifth, sixth, seventh, eighth, ninth,
tenth, and eleventh issues and New’s third, fourth, fifth, sixth, seventh, eighth, and ninth
issues. Because of our disposition of these issues, it is not necessary that we address the
remaining issues. Tex. R. App. P. 47.1.
          We reverse the trial court’s judgment and set aside the permanent injunction. We
render judgment that the Barreras take nothing against Amey and New.


                                                                           FEDERICO G. HINOJOSA
                                                                           Justice


Opinion delivered and filed this the
15th day of January, 2004.